2006 OK CIV APP 80
**Raymond D. HALE and Lillian Hale, Plaintiffs/Appellees,**

**v.**

**A.G. INSURANCE COMPANY, Defendant/Appellant.**

**No. 101208.**

Court of Civil Appeals of Oklahoma, Division No. 3.

March 24, 2006.

Certiorari Denied June 12, 2006.

As Corrected April 5, 2006.

Richard D. Gibbon, Gibbon, Barron, & Barron, P.A., Tulsa, OK, for Plaintiffs/Appellees.

Neal E. Stauffer, John A. Coates, Nathan G. Parrilli, Stauffer, Graves & Nathan, Tulsa, OK, for Defendant/Appellant.

1. The trial court denied Insurer's demurrers and motions for directed verdict. The jury verdict led to judgment, awarding compensatory damages, punitive damages, attorney fees, costs, and pre-judgment interest totaling $492,293.53.

When an action is pressed for bad-faith refusal to settle-first recognized as a distinct tort in *Christian v. American Assur. Co.*—the plaintiff may seek damages (a) for the *loss payable under the policy* together with (b) those *other items of recovery* that are consistent with harm flowing from insurer's bad-faith breach of its implied-in-law duty to settle. In sum, while no identifiable *ex contractu* recovery is achieved by the victorious bad-faith plaintiff, *indemnity for loss (under the contract)* constitutes the

KENNETH L. BUETTNER, Chief Judge.

■ ¶1 Defendant/Appellant A.G. Insurance Company, an Oklahoma Farm Bureau company, (Insurer), appeals from a judgment entered in favor of Plaintiffs/Appellees Raymond D. and Lillian Hale. The Hales filed their Petition alleging Insurer breached its duty of good faith and fair dealing following the Hales' claim for insurance benefits. The Hales did not state a claim for breach of the insurance contract.[1] The Hales sought compensation for a loss under the fire coverage provision of the property insurance policy covering a convenience store owned by the Hales. The evidence admitted at trial showed Insurer had a legitimate dispute to the Hales' claim, which Insurer was entitled to have resolved at trial. Where an insurance company has a legitimate dispute to a claim, there can be no bad faith. Accordingly, the trial court erred in submitting the issue of bad faith to the jury. We reverse.

¶2 The Hales purchased a convenience store in Eufaula, Oklahoma. Their son, Raymond C. Hale (Chance Hale), applied for insurance for the store from Insurer. Insurer is a mutual insurance company owned by its members. The application for insurance listed Chance Hale and the Hales as members. The policy states the named insured is "Chance's Convenience Store." The evidence indicated Chance Hale was the primary operator of the store. Insurer sent notice to the store that it was cancelling the policy for non-payment and that the policy would be void as of December 11, 2001.[2] At that time, the Hales were staying in Arizona

centerpiece *element of damages* included in every *ex delicto* recovery for bad-faith refusal to settle.
*Taylor v. State Farm Fire and Cas. Co.*, 1999 OK 44, 981 P.2d 1253, 1258 (emphasis in original, citations omitted).

2. Insurer's Exhibit 61 is a November 20, 2001 letter to "Chances," which states that the pre-authorized payment was returned by the bank for insufficient funds and that "because of non-payment of premium the following policy expires and is void effective" December 11, 2001. Insurer's Exhibit 62 is a December 4, 2001 letter to "Chances Conv Store" which states "this is to advise you that we are cancelling this policy ...

because of Mr. Hale's health. On December 7, 2001, Chance's Convenience Store was severely damaged in a fire.

¶3 Insurer immediately began to investigate the fire. The State Fire Marshall determined the fire was caused by arson, and Insurer discovered evidence of financial motive on the part of the Hales and Chance

Hale. The Hales returned to Oklahoma in May 2002 and filed a proof of loss statement May 13, 2002. The Hales filed their bad faith Petition August 21, 2002.[3]

¶4 In its Answer, Insurer denied that it had acted in bad faith and denied the Hales' claims.[4] Insurer also denied the Hales are the sole owners of the insured property.[5]

due to non-payment of premium." This letter also shows December 11, 2001 as the cancellation date.

3. In their Petition, the Hales alleged that after they made their claim for their loss under the policy, Insurer had failed to make any offers of settlement or to conclude its responsibility under the terms of the policy. The Hales next averred that Insurer began its investigation, but failed to determine the amount of the loss or the amount payable to the Hales; they claimed Insurer instead spent its time "trying to determine a reason for not paying the claim rather than a determination of reason for paying the claim." The Hales asserted that Insurer's failure to perform an adequate and proper investigation and to determine the amount of loss within a reasonable time was a breach of the covenant of fair dealing, which damaged the Hales in the amount of $266,000. The Hales asserted the breach of the covenant of fair dealing caused them mental anguish, worry and concern about Insurer's failure to pay the amount due under the policy and about continuing to pay the mortgage debt on the property. The Hales asserted this worry and concern caused Raymond D. Hale's health to deteriorate to the point that he was hospitalized numerous times, and caused Lillian Hale to worry about the convenience store and about her husband's deteriorating health. Lastly, the Hales asserted that Insurer's investigation of their claim damaged their reputations and had been detrimental to their enjoyment of life.

While the Hales made no claim for breach of contract, they sought damages of $266,000 "on the contractual action," and "for actual damages on the tort of 1 million dollars and punitive damages in a sum to be set by the jury."

4. As affirmative defenses, Insurer alleged the fire was intentionally set, the Hales (or some other insured) caused or procured the fire, the Hales (or some other insured) concealed the cause of the fire, the Hales (or some other insured) made intentional material misrepresentations in their sworn proof of loss statement (Insurer alleged the Hales claimed losses for items either they did not own or that were not damaged in the fire), the Hales (or some other insured) materially misrepresented their activities at the time of the fire, the Hales (or some other insured) materially misrepresented their financial condition at the time of the fire, the Hales (or some other insured) intentionally concealed material facts in the presentation of the claim, and that the Hales

are barred from recovering because they (or some other insured) breached the duty of good faith and fair dealing owed to Insurer.

5. At the same time it filed its Answer, Insurer filed a motion to join Raymond C. (Chance) Hale as a plaintiff. Insurer asserted Chance Hale is the Hales' adult son and that Chance and the Hales all were involved in the ownership and operation of "Chance's Convenience Store." Insurer attached the application for insurance which listed "members' names" as Raymond D, Lillian, or Chance Hale, and which was signed only by Raymond C. (Chance) Hale. The two different signature lines signed by Chance Hale on the application for insurance included the phrase "I make each statement ... to induce (Insurer) *to issue to me* a policy of insurance...." The insurance policy shows the named insured is "Chance's Convenience Store." Also in its motion to join Chance as a party, Insurer alleged Chance Hale claimed the business loss and the mortgage interest for the store on his personal tax return for 2000. Insurer attached Chance Hale's 2000 Tax Return, which included Schedule C, Profit or Loss from Business, Sole Proprietor, showing Chance Hale as the proprietor of Chance's Convenience Store. That schedule showed a net loss of $34,524. Insurer also attached state and federal employment tax returns filed in the name of Raymond C. (Chance) Hale d/b/a Chance's Store. Insurer additionally attached tax year 2001 W–2 forms for the convenience store's employees which named Raymond C. Hale as employer. Insurer asserted that disposition of the case without joinder of Chance Hale would possibly leave Insurer subject to a substantial risk of incurring double or otherwise inconsistent obligations by reason of Chance Hale's ownership interest in the property.

The Hales responded that Chance Hale has no interest in this suit, and they attached an affidavit from Chance Hale denying his interest in the suit. Following a hearing in which the parties contested whether Chance Hale was an insured under the policy, and whether he procured insurance for property he did not own, the trial court found Chance Hale had no ownership interest in the convenience store. The trial court overruled Insurer's motion to join Chance Hale as a plaintiff.

Insurer has not raised this issue in its appellate brief. However, the evidence of Chance's own-

¶ 5 Jury trial was held June 7–10, 2004. The trial court excluded any evidence obtained by Insurer more than 90 days after the Hales submitted their proof of loss. The jury returned its verdict, finding in favor of the Hales and awarding actual damages of $226,000. The verdict form further indicated the jury found by clear and convincing evidence that Insurer recklessly disregarded its duty to deal fairly and act in good faith with the Hales. The jury then awarded punitive damages of $226,000.[6] The trial court awarded $23,818.03 in pre-judgment interest and $16,475.50 as costs and attorney fees, for a total judgment of $492,293.53.

¶ 6 Insurer now appeals. Insurer's first assertion of error is that the trial court abused its discretion in excluding any evidence obtained by Insurer more than 90 days following the proof of loss statement. We may not reverse a judgment based on the trial court's exclusion of evidence unless it appears from review of the whole record that the error has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 47, 121 P.3d 1080; 12 O.S.2001 § 78 and § 2104. "When it is probable a verdict would have been unchanged even had the rejected evidence been admitted, this Court is not warranted in reversing the cause based on the erroneous exclusion." *Id.* The trial court has discretion to admit or exclude evidence. *Id.* at ¶ 60. The Hales argued, and the trial court agreed, that based on 36 O.S. 2001 § 3629,[7] an insurance company has a duty to settle or deny a claim within 90 days and that therefore *any information obtained by the insurer later than 90 days after the proof of loss is not relevant to a bad faith claim.* Section 3629 is a prevailing party attorney fees provision. It serves to encourage prompt resolution of insurance claims by keying entitlement to an award of fees to a particular date. *Association of County Com'rs of Oklahoma v. National American Ins. Co.*, 2005 OK CIV APP 44, ¶ 19, 116 P.3d 206. However, the 90 day time period in § 3629 does not trigger liability under the policy. *Shinault v. Mid–Century Ins. Co.*, 1982 OK 136, 654 P.2d 618. In *Shinault*, the Oklahoma Supreme Court held that § 3629 affects the right to prevailing party attorney fees only, and states that the bad faith remedy is available for cases where the insurer's conduct is malicious or indifferent to the claim. *Id.* at 619. Nothing in *Shinault* suggests bad faith is triggered by the expiration of the 90 days in the attorney fees statute. We have found no case limiting admissible evidence to that obtained within the arbitrary period of 90 days. Indeed, we have found no bad faith case even addressing the issue of excluding evidence gained in investigating a claim beyond 90 days; the analysis in bad faith cases indicates the cutoff for relevant evidence is the date of payment or denial of

ership actions and apparent financial motive are relevant to a determination of Insurer's belief, *at the time its performance was requested,* whether it had a legitimate dispute to coverage. At a minimum, evidence that Chance Hale claimed business losses for a business he purportedly did not own suggests fraud. The trial court found Insurer had not alleged fraud with sufficient specificity in its Answer.

6. The jury indicated it did not find by clear and convincing evidence that Insurer intentionally and with malice breached its duty of good faith. The punitive damages amount was therefore limited to the greater of *$100,000 or the amount of actual damages. 23 O.S.Supp.2002 § 9.1* (B).

7. That statute provides:

A. An insurer shall furnish, upon written request of any insured claiming to have a loss under an insurance contract issued by such insurer, forms of proof of loss for completion by such person, but such insurer shall not, by reason of the requirement so to furnish forms, have any responsibility for or with reference to the completion of such proof or the manner of any such completion or attempted completion.

B. It shall be the duty of the insurer, receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to the insured within ninety (90) days of receipt of that proof of loss. Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party. For purposes of this section, the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement. In all other judgments the insured shall be the prevailing party. If the insured is the prevailing party, the court in rendering judgment shall add interest on the verdict at the rate of fifteen percent (15%) per year from the date the loss was payable pursuant to the provisions of the contract to the date of the verdict. This provision shall not apply to uninsured motorist coverage.

the claim. The duty of good faith and fair dealing exists during the time the claim is being reviewed. See *Newport v. USAA*, 2000 OK 59, 11 P.3d 190 and *Skinner v. John Deere Ins. Co.*, 2000 OK 18, 998 P.2d 1219.

¶ 7 In this case, Insurer challenges the exclusion of the statements under oath made by the Hales, the Hales' joint personal tax returns for the years 2000 and 2001, and Chance Hale's personal tax return for the year 2000. The Hales' statements under oath were made September 4, 2002, which was about 110 days after they submitted their proof of loss. The record contains correspondence between counsel for the Hales and Insurer showing Insurer attempted to take the Hales' statements under oath in July 2002. The Hales' statements under oath include relevant evidence on the key issue of financial motive, which was one of Insurer's stated bases for denying the claim. The statements also were relevant for impeachment purposes. The trial court abused its discretion in excluding the statements under oath. The tax returns also were relevant to show financial motive, as well as Chance Hale's ownership interest. Insurer sought to introduce the Hales' tax returns to impeach Lillian Hale's testimony that the convenience store was profitable. Insurer sought to introduce Chance Hale's tax returns to show that Chance Hale claimed the convenience store's profits and losses on his personal returns and listed himself as the owner of the store on his returns. At trial, Insurer argued that he obtained Chance Hale's tax returns before the 90 day period passed.[8] The Hales argued the returns of a non-party were not relevant. Insurer attached Chance Hale's tax return to its September 30, 2002 Motion to Join Chance Hale as a party. That date was less than two months after the 90 day cutoff imposed by the trial court. Chance Hale's tax return was relevant for Insurer's dispute of coverage, which again is the key issue in a bad faith case.

¶ 8 We find no authority for an arbitrary cutoff for admitting relevant evidence, obtained before denial of the claim, based solely on a prevailing party attorney fees statute. To be sure, unreasonable delay in settling or denying a claim is a factor in proving bad faith, but nothing supports a finding that delay beyond 90 days is patently unreasonable. This is particularly so in a case such as this where Insurer had clear indications, from the time of the fire, that the fire was intentionally set and that the Hales or Chance Hale had a financial motive. Insurer's further investigation of those issues was reasonable and the trial court therefore abused its discretion in excluding otherwise relevant evidence on this basis. This exclusion was prejudicial because the jury could have found that Insurer had a good faith basis for denial based on the evidence that the store burned four days before the insurance lapsed, the owners had a financial motive for burning the store which was losing money, and there was evidence of arson.

¶ 9 Insurer next asserts the trial court erred in denying its requests for directed verdict. We find the evidence showed that Insurer's coverage dispute was legitimate and that as a result, the trial court erred in denying Insurer's requests for directed verdict. It is clear from the trial court's rulings that it confused the elements of a bad faith claim with those for breach of contract.

¶ 10 An insurer has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received." *Christian v. American Home Assurance Co.*, 1977 OK 141, 577 P.2d 899, 901.[9] Tort liability for breach of that duty arises where there is a clear showing that the insurance company unreasonably and in bad faith withheld payment of the claim of the insured. *Id.* The central question in a claim for bad faith failure to settle or investigate an insurance claim is: what did the insurance company know, or what should it have known at the

---

8. Chance Hale's statement under oath was taken August 14, 2002, the 90th day following the proof of loss.

9. In *Christian*, the evidence at trial showed that the insurance company did not have, and had never had, a defense to the plaintiff's claim.

time the insured requested payment under the applicable policy, i.e., whether the insurer had a justifiable, reasonable basis to withhold payment when the insured requested the carrier to perform its contractual obligation. *Newport, supra* 11 P.3d at 195; *Conti v. Republic Underwriters Ins. Co.*, 1989 OK 128, 782 P.2d 1357, 1362; *Buzzard v. McDanel*, 1987 OK 28, 736 P.2d 157, 159.

¶ 11 Because disagreements may arise over the amount of coverage, the cause of loss, and breach of the policy conditions, the duty of good faith and fair dealing does not preclude the insurer's right to deny a claim, resist payment, or litigate any claim to which the insurer has a legitimate defense. *Skinner, supra* at ¶ 16. The reasonableness of any investigation conducted by the insurer is, thus, oftentimes one of the main issues in the bad faith tort case. *Hall v. Globe Life and Acc. Ins. Co.*, 1998 OK CIV APP 161, ¶¶ 4–8, 968 P.2d 1263, 1265–1266 (cert.denied). Also, expert testimony on the adequacy or inadequacy of the carrier's pre-denial investigation may be relied on by both sides to support their respective positions in the case. See *Id.*, 1998 OK CIV APP 161, at ¶¶ 7–8, 968 P.2d at 1266.

¶ 12 We review the denial of a motion for directed verdict de novo. *Computer Publications, Inc. v. Welton*, 2002 OK 50, 49 P.3d 732, 735. After taking as true all evidence favorable to the non-moving party and all reasonable inferences drawn therefrom, and disregarding all evidence favorable to the moving party, we will affirm the denial of a directed verdict unless there is an entire absence of proof on a material issue. *Id.*, citing *Franklin v. Toal*, 2000 OK 79, ¶ 13, 19 P.3d 834, 837; 12 O.S.2001 § 698. To determine whether Insurer was entitled to a directed verdict then, we must take all of the evidence in the light most favorable to the Hales and only if there is an entire absence of proof on the issue of unreasonable conduct by Insurer will we find error in the denial of the request for directed verdict. In *Badillo, supra*, the court recognized that a directed verdict should be granted only if the party opposing the motion has failed to demonstrate a prima facie case for recovery. 121 P.3d at 1092, citing *Gillham v. Lake Country Raceway*, 2001 OK 41, 24 P.3d 858. The court then explained that the

> essential elements [plaintiffs were] required to show to make out a prima facie case were as follows: 1) [they were] covered under the ... insurance policy ...; 2) the actions of insurers were unreasonable under the circumstances; 3) insurers failed to deal fairly and act in good faith toward [them] in their handling of the ... claim; and 4) the breach or violation of the duty of good faith and fair dealing was the direct cause of any damages sustained by [plaintiffs].

*Badillo, supra*, 121 P.3d at 1093. The decisive question is whether the insurer had a "good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy." *Buzzard, supra*, at ¶ 14.

¶ 13 The Hales argue Insurer acted in bad faith by investigating the loss-specifically in investigating the cause of the fire, the ownership of Chance's Convenience Store, and the financial circumstances of the Hales and their son; and by not paying the claim within 90 days of their proof of loss. John Richardson, the adjuster who handled the Hales' claim testified during the Hales' case regarding Insurer's actions after the fire.[10] Counsel for the Hales asked Richardson why the case had not been settled and Richardson responded:

> First of all the fire is an intentionally set fire. The ... state fire marshal agent says that and the expert ... Mr. Dave Dallas, says that. It's an intentionally set fire.... The next reason is that when we begin (*sic*) to look into it we found ... (The Hales) are in financial straits. They live on a fixed income.... Mr. Hale is in terribly bad health. And that certainly affects your income and your lifestyle and the amount of money you have to

---

**10.** Richardson testified that a couple of days after the fire, Insurer's field adjuster called to tell him there had been a major fire at a convenience store. Richardson explained that when faced with a major fire, Insurer's first task is determining the cause of the fire. Richardson hired Dallas and Associates, a fire cause and origin consultant.

spend....(Insurer) had sent (The Hales) a letter, in fact two letters, before the fire explaining to them that since they haven't paid their premium for their insurance policy that policy was going to be canceled effective December the 11th, four days after the fire. The fire occurred four days before their policy would have been canceled for nonpayment of premium. .... I attended the cause of origin inspection with Mr. Dallas. I wanted to be there to see what he saw. They were out of gas. The pumps had signs on them, paper signs, no gas for sale. I then found out that the store had been closed since December the 4th, three days before the fire. No gas for sale.[11]

When asked what evidence Insurer had by August 15, 2002 to make that decision, Richardson responded that he had evidence of financial motive: "Certainly the motive is that the store is closed. It's not producing any money." Richardson explained that Carol Yandell, Mrs. Hale's sister, who helped manage the store, informed the adjuster the convenience store "had not made money since day one, the store was not making any money at that time...." Richardson testified further on evidence of financial motive.[12] Richardson testified that Insurer decided the fire was an arson based on physical evidence at the scene. Richardson explained that he looked to the Hales as having arranged the fire because "(t)hey certainly have more than a financial motive. They need the money. They need out of the store."

¶ 14 Counsel for the Hales then asked Richardson about the policy. Richardson agreed that the named insured on the policy is "Chance's Convenience Store." Insurer believed Chance Hale was involved in the ownership of the store. Richardson explained that Chance Hale purchased the insurance, signed all the applications for insurance, and signed documents required by the State to be signed by a business's owner. Counsel for the Hales then asked if the investigators hired by Insurer found that the Hales were the sole owners of the convenience store within a few days of the fire. Richardson did not remember that. Richardson agreed that he understood that the Hales owned the property, but he believed Chance Hale was a co-owner.

¶ 15 Another basis for Insurer's denial of the claim was Insurer's belief that the Hales had misrepresented their ownership of or the value of certain items claimed in the proof of loss.[13] Counsel for the Hales asked why Insurer did not pay the Hales for the items that were properly listed on the proof of loss and Richardson responded that it was insurance fraud for the Hales to claim items that either they did not own, or were not damaged, or were not contents. Richardson agreed no one from Insurer ever met with the Hales after the fire, but Richardson explained that was because first the Hales were in Arizona for some time after the fire, and then the Hales hired an attorney immediately after returning from Arizona and the adjuster could no longer speak to them directly.[14] Richardson explained that he believed, based on the number of items improperly

**11.** Richardson testified that Insurer did not believe the Hales actually started the fire, but that the Hales "understood the fire was going to be set in order to fraud the policyholders of (Insurer)." He believed the Hales were a party to the arson.

**12.** Richardson explained that to get capital to buy the convenience store, the Hales had sold their home to Darrin Blake, who owed the Hales an $85,000 balloon payment right at the beginning of 2002. Before the fire, the Hales learned that Blake would not be paying them. Richardson then explained another reason for his conclusion the Hales were party to the fire: "In the gasoline it became apparent that they had not been able to pay for gasoline. They had written-I call them hot checks-insufficient fund checks to pay for gasoline. And the supplier had told them that unless they had the money they weren't

getting anymore gasoline. And apparently they didn't because they didn't have gasoline." Richardson also testified the Hales had a dispute with another gasoline distributor, Hooten Oil, over $11,000.

**13.** Richardson explained that on their proof of loss, the Hales claimed fixtures, such as ceiling fans, kitchen sinks, a walk-in refrigerator, bathroom fixtures, and faucets as lost contents. Richardson further testified the Hales claimed to have lost an ATM machine worth $26,000 and an ice machine, both of which the Hales did not own. The Hales also claimed the gas pumps as a loss, but those were not damaged in the fire.

**14.** Counsel suggested the Hales may not have understood that fixtures were not contents, and asked if normally Insurer would send an adjuster to help its insureds make a proper claim.

included in the proof of loss, that the Hales intended to claim things that were not damaged or were not their property. Richardson also testified that the Hales misrepresented their ownership in the application for insurance filed by Chance Hale, and that such misrepresentation affected Insurer's view about the Hales' intent in making the proof of loss.

¶ 16 The Hales attempted to show that Insurer's belief that they were involved in the arson was unreasonable.[15] The Hales also claimed Insurer acted in bad faith by performing criminal background checks on them as part of its investigation. Richardson responded that the background checks were a usual part of an arson investigation.[16]

¶ 17 After Insurer cross-examined Richardson, the Hales rested. Insurer then demurred to the evidence and requested either a directed verdict or dismissal. Insurer contended that the evidence presented had shown it had a legitimate dispute to the claim as to the cause of the fire, and the ownership and value of the claimed losses. Insurer asserted the Hales had produced no evidence to show Insurer's denial of the claim was unreasonable. The Hales responded that reasonableness of the insurer's action is the only issue, and that what is reasonable is always a jury question. The Hales responded also: "there is certainly a large question as to whether or not (the Hales) had anything to do with this fire even if it was a set fire." Insurer replied that the Hales therefore admitted Insurer's dispute was reasonable. The trial court overruled Insurer's requests.

¶ 18 In presenting its case, Insurer first called Philip Cheatham, an agent for the

---

**15.** Richardson agreed that long before the fire, Insurer's agent recognized the improvements the Hales were making to the store and increased the amount of contents coverage. Richardson explained, however:

A: Things change. I think they did have every intention of making the store go, and it being a profitable venture and helping them in their retirement. You bet. I believe that was their intention. And they did it with every goal to do that. And I applaud it. It just didn't work.
Q: In your investigation that you have before you and you weigh that investigation and come up with the determination that that (sic) they were forced into burning the store because of their financial condition. What other evidence did you have that just said that's crazy? Crazy.
A: I don't understand your question. I'm sorry.
Q: Well, did you have evidence in your file that if you would have give (sic) consideration to that would have made your decision just flat crazy?
* * *
Q: ... Let me try again. Did you have anything in your file that weighed in relation to the value of this property, the future picture that this property had, the fact that it-that there was (sic) people wanting to buy it, that there were people of-very substantial people telling your file through your investigation that these two people are as upright and as great as they are they've got something over there that is a golden egg-I'm using my words now-a golden egg and that this property is going to gain in value everyday, the school's coming in, and they point out all of that to you. Is that in your file?
A: You know, ..., there's a vein of truth in what you say ... and you are right. The property-and I think that's an important part here. That location is a really, really good location. And certainly that location is worth a lot of

money without the building being on it.... I think Mr. and Mrs. Hale started out with every intention of making a really nice business here. And their goal was to have a business that would produce an income in their later years. And I applaud that. But as it turned out it didn't work. Now, the property itself if still worth a lot of money. There's a school there. It's a very valuable piece of land. And I couldn't agree more with you.
Q: What is it valuable for? ... Is it good to have a convenience store?
A: I don't have that background, but I assume it would be.
Q: ... Did you have knowledge that there were people interested in buying it?
A: It's my understanding that there were people that had considered buying it. I don't know that they were interested or had made an offer. But there had certainly been conversations about selling the business and people buying the business, absolutely.
Q: They could have sold that property immediately and got out of there (sic) immediate problem, if you think they had one, couldn't they?
A: I don't know that they could. There was (sic) conversations about that.

**16.** Richardson believed it was reasonable and proper, in a case with an intentionally set fire, to do a criminal background check on the insureds. The background checks revealed no criminal or civil matters involving the Hales or Chance Hale. Counsel for the Hales asked if Richardson was insulted that his investigator had used the word "suspect" in his report about the Hales, who were insured by Insurer. Richardson responded that "suspect" was not his word, but that the word was reasonable in a case where there is a set fire and Insurer must figure out who did it.

State Fire Marshal. Cheatham testified that he first reported the cause of the fire was undetermined, but he changed his opinion to arson because he heard someone had been seen in the store just before the fire started and because the store had "quite a bit of flammable liquids inside...."[17] Three weeks after the fire, Cheatham informed Insurer that he believed the fire was an arson. Cheatham testified that out of hundreds of fires he had investigated, only three or four involved the insured actually lighting the match because the insureds often are out of town or have alibis. David Dallas, Insurer's cause and origin expert testified next. Dallas presented photos to support his testimony. Dallas testified that his investigation showed the convenience store fire was an arson.[18] Dallas determined that the pour patterns and the three areas of concentrated burning proved the fire was deliberately set. Dallas testified that he did not examine the gasoline pumps outside the store, except that he noted the paper signs on the pumps, indicating the store was out of gas, were not burned or smoke-damaged.

¶ 19 Insurer also presented Darrin Blake, who testified he had bought the Hales' home. The Hales told him they were suffering financially before the fire. The Hales wanted to alter their agreement with Blake and there was a confrontation when Blake wanted the change to be in writing. Blake refused to make a payment to the Hales without an agreement in writing and he later abandoned the house he was buying from the Hales.

¶ 20 The Hales did not present any evidence on the cause of the fire. At the conclusion of Insurer's case, it again asked for a directed verdict. The trial court responded:

Well, what the Court has heard at this time there is no doubt in the Court's mind that-well, there is some doubt in my mind as to whether this was an arson, based upon the conflicting testimony of two witnesses. But there is nothing in the record

17. Cheatham then presented a metal fuel can and explained why he determined the can had been opened before the fire. Cheatham testified there were several other camp fuel cans in the store and some had been opened before the fire, and some had been left closed because their tops were blown off from the heat in the fire. Cheatham did not discover pour patterns in the store. Cheatham testified that he interviewed Chance Hale after the fire at Chance's attorney's office. Cheatham also interviewed other store employees. One employee met with Cheatham at the Eufaula pardon and parole office because she did not want anyone to know she was talking to the investigator. Cheatham explained that at the scene of the fire he found the camp fuel and other flammable products. Cheatham testified also that he called Mrs. Hale and asked to interview her in person but she never called him back.

Cheatham testified that he learned from Chance Hale that Chance had checked into a hotel in Tulsa at 11:24 p.m. the night before the fire, and checked out at 11:41 a.m. the morning of the fire. Cheatham also testified that Green the person who arrived at the store to fill the newspaper machines gave a statement to a local police officer after the fire. He reported that he drove up at 3:30 a.m. and he thought saw a tall, thin person walk from one end of the store to the other.

18. He testified he found glass that had been blown fifty feet from the windows of the store, and the glass showed there had been an accumulation of gas in the building before it ignited. Dallas determined there was no fire in the building "before ignition occurred to displace this glass. Otherwise there would be carbon deposits on the glass." Dallas found that the front door of the store had carbon on it, indicating it was closed at the time of the fire. Dallas determined the back door was closed during the fire too, based on areas where the door was not damaged by heat and areas where it was damaged and insulation had melted out. He determined the back door had been opened by "fire service activities."

Dallas found evidence showing the direction the fire spread. Dallas found three areas of concentrated burning. Dallas testified that he found fuel containers on storage shelves and determined that one can was closed because it was bulging, but another one was empty and the cap was gone. Another can had the cap on and was partially bulging, which showed Dallas it was empty enough that it did not explode or blow the cap off.

Dallas found the source of ignition was a kerosene lantern, and from the carbon pattern on the lantern, he determined it had been laying on its side during the fire. Dallas also found that the stock level in the store was low at the time of the fire. Dallas testified that the burn area he found in the dining room of the convenience store showed a burn pattern consistent with poured liquid fuel, which circled around toward the kitchen and went over a table and chairs, damaging the seats and table top. From the dining area, the pour pattern went towards the cash register.

which can substantiate or even lie claim to a criminal charge of arson against Lillian and Raymond Hale. There is nothing in there. So I would have to have that before I could go with a motion for directed verdict.....

This is a misstatement of the proof required in a bad faith case. Insurer was required to prove only that it had a legitimate dispute to coverage. Only in a breach of contract case, which this was not, would Insurer be required to prove the facts of arson and the Hales' participation. The undisputed evidence showed Insurer had a good faith belief, at the time it was reviewing the case, that the claimed loss was due to arson and that the insureds, either the Hales or Chance Hale, had a motive. The Hales' asserted Insurer acted in bad faith only in not paying their claim within 90 days and in investigating their claim instead of paying it. In these circumstances, an action for bad faith will not lie. See *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431 (10th Cir. (Okl.)1993).

¶ 21 Two similar Oklahoma cases support the conclusion there was no bad faith in this case as a matter of law. *Manis v. Hartford Fire Insur. Co.*, 1984 OK 25, 681 P.2d 760, involved a suit against an insurance company for breach of contract and for bad faith refusal to pay a claim. The jury found in favor of the plaintiffs on both claims, but the insurer appealed only the bad faith judgment. The Supreme Court first noted that in a bad faith action, the plaintiff bears the burden of proof. *Id.* at 761. After restating the law on bad faith claims, the court found that the facts showed the insurer's conduct in withholding payment was reasonable because, first, there was physical evidence that the fire was a set fire, and second, there was circumstantial evidence, including tax returns, showing that the burned business had operated at a loss for four years, and that the plaintiff had increased the mortgage debt on the building.[19] *Id.* at 762. The court stated further:

> The defense of arson is provable by circumstantial evidence. "In an action to recover on a fire insurance policy that is defended on the ground that the insured set the fire or procured the fire set where there is not direct proof to so connect the insured with the fire, proof that the fire was of incendiary origin coupled with proof of motive, intent and opportunity on the part of the insured constitutes sufficient evidence to justify submitting the issue to the jury." Defendant's evidence, if believed by the jury, could have supported an arson defense.

*Id.* (citations omitted). The court in *Manis* then explained that because there was sufficient evidence of arson that a jury could have believed the insurer's defense of arson, the

19. These facts are clearly distinguishable from those in *McCoy v. Okla. Farm Bureau Mut. Ins. Co.*, 1992 OK 43, 841 P.2d 568, where the jury found in favor of the plaintiff on breach of contract and bad faith, the Oklahoma Court of Civil Appeals reversed the bad faith judgment, and the Oklahoma Supreme Court reinstated and affirmed the bad faith judgment. In *McCoy*, the plaintiff alleged his home burned due to faulty wiring. The insurance company waited a year before asserting its defenses that the fire was arson, the plaintiff misstated his losses, and the homeowner increased or ignored the hazard leading to the loss. The insurance company's adjuster found nothing suspicious about the fire and requested an advance payment to the homeowner, the insurance company's internal documents showed the company was experiencing cash flow problems and had directed its adjusters to stall payment of claims, there was conflicting evidence on the cause of the fire, the State Fire Marshal ruled the fire was accidental, and eyewitnesses contradicted (and the plaintiffs expert impeached) the testimony of the insurance company's cause and origin expert, who offered the only testimony that the fire was arson. The homeowner also showed that he had paid all premiums due on the policy and otherwise disproved the insurance company's claim that he was in a financial bind. The Supreme Court found the jury had been presented with conflicting evidence of whether the insurer had a good faith belief, at the time its performance was requested, that it had a legitimate basis for withholding payment, and held there was competent evidence to support the jury's bad faith verdict. *Id.* at ¶¶ 21–22.

The facts of this case are also clearly distinguishable from those in *McCoy*. In this case, the Hales offered no evidence of any other cause of the fire, there was no evidence that Insurer sought to avoid paying otherwise valid claims, the State Fire Marshal and Insurer's expert agreed the fire was arson, the evidence showed the store was struggling financially, and Insurer determined immediately that the fire had been set intentionally-it did not posit that defense belatedly.

case clearly differed from *Christian, supra,* where the insurer plainly had *no* defense to the claim. *Id.* The court noted that simply because the plaintiffs prevailed on the breach of contract claim, which necessarily meant the jury did not believe the arson defense, did not mean that insurer's dispute of the claim was made in bad faith. *Id.* The court held the insurer's actions were reasonable and legitimate as a matter of law, facts were in dispute as to the cause of the fire, and the insurer had a right to have that dispute settled in court. *Id.* The court therefore concluded that the plaintiff had failed to meet his burden of proof and it was therefore error to submit the issue of bad faith to the jury. The court recognized that "(t)o hold otherwise would subject insurance companies to the risk of punitive damages whenever litigation arises from insurance claims. Insurance companies have the right to dispute a claim in good faith." *Id.*

¶ 22 The holding in *Manis* requires reversal of this case. As noted above, at the time it was reviewing the claim, Insurer had direct evidence that the fire was arson and it had circumstantial evidence of financial motive and opportunity on the part of the store's owners: the store had been losing money, the Hales were living on disability and had continued to put their own money into the store to pay the store's bills, the store had no gasoline and had been closed for a few days at the time of the fire, the Hales had learned a lump sum payment from Darrin Blake would not be paid, and the insurance policy would expire in four days due to the premium being returned for insufficient funds. This evidence, if believed by a jury, would have supported Insurer's arson defense to the claim. Under *Manis,* Insurer therefore had a legitimate dispute to coverage as a matter of law and it was error to submit the issue of bad faith to the jury.

¶ 23 In *Conti v. Republic Underwriters Insur. Co.,* 1989 OK 128, 782 P.2d 1357, the insured's home was purchased by contract for deed and legal title was put in the name of the insured's father. The insured and his parents considered the home as belonging to the insured. The insured's father contacted the insurance company and asked for an insurance policy covering the house and designating the insured as owner. Later, while the insured was on vacation, the home burned due to arson. The insured's father contacted the insurance company. When the insured returned to town, he learned he was the prime suspect in the arson. The insurance company questioned the validity of the claim because it was an arson and because the local fire department told the insurer the insured had moved items of personal property from the house to storage on the property. The moved property was later determined to belong to the insured's girlfriend and to have been stored for convenience, but in the meantime, the insurer's suspicions caused it to deny the claim. The insured filed suit alleging causes of action for both breach of contract and bad faith. The jury awarded judgment to the insured on both claims and awarded contract damages of $64,000 and exemplary damages of $200,000 for bad faith.

¶ 24 The insurer appealed the denial of its request for directed verdict on the bad faith claim.[20] The insurer in *Conti* asserted three

---

20. The Supreme Court easily disposed of the insurer's first asserted claim that there was a legitimate dispute, regarding the insured's interest in the property. The facts in *Conti* on this issue mirror those in this case: the father purchased the home and took title, but the family treated the home as the son's property and it was insured in the son's name. In that case, the court explained that the insurer had no legitimate dispute to the son's ownership:

The sole support for (insurer's) argument is that bare legal title to the property remained in the name of appellee's father. It is an accepted fact that the appellee had undisputed possession of the property. Nor is there any question that the appellee enjoyed beneficial ownership, or that he had equitable title by virtue of his contributions and the intent expressed by all parties to the original transaction. It has long been recognized in Oklahoma that an insurer may not escape its contractual obligation to one who has equitable title, beneficial ownership and undisputed possession of property, even though bare legal title rests in another.

"Insurable interest" is defined as "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment." The record shows that the appellee had substantial actual, economic interest in this house, and that his interest was certainly lawful, . . . .

782 P.2d at 1360 (citations omitted). This analysis actually supports Insurer's claim here that it

legitimate disputes. The Supreme Court found that a directed verdict should have been granted based on the last of the three, which was the insurer's arson defense. The court noted it had previously held that it was error to submit the issue of bad faith to a jury where 1) the insurer's evidence, if believed by the jury, could have supported an arson defense, and 2) the plaintiff failed to meet his burden of proof, citing *Manis, supra. Conti* is similar to the instant case in that in *Conti* it was clear the fire was an arson, but the facts were in dispute as to the party responsible. In *Conti*, the insured failed three polygraph tests and the trial court excluded that evidence. The Supreme Court held that the trial court should have considered that evidence in ruling on the motion for directed verdict, because it supported the insurer's assertion it had a reasonable belief that the insured was the arsonist. 782 P.2d at 1362. The court noted that whether the polygraph was accurate was not relevant; the evidence that the insurer had received those results was relevant to show it did not act in bad faith. *Id.* The court concluded that the uncontested facts before the trial court showed 1) the loss was the result of arson, 2) the insured failed polygraph tests, and 3) gasoline cans were found at the scene. The court held "(t)he aggregate of these factors demonstrate that the appellant's actions in withholding payment on the claim were reasonable. Here there was a legitimate dispute with respect to who was responsible for the arson." The court therefore held that it was error to submit the issue of bad faith to the jury. *Id.* The court therefore affirmed the breach of contract judgment, but vacated the award of damages for bad faith.

¶ 25 While polygraph tests were not at issue in this case, we find similarly that the combination of the physical evidence of arson and the evidence of financial motive (including the timing of the fire just before insurance was canceled for non-payment) on the part of the Hales and Chance Hale (who Insurer had a reasonable basis to believe was an insured owner), gave Insurer a legitimate dispute and a reasonable basis to investigate the claim and to delay payment.

¶ 26 For the reasons explained, the evidence submitted by the Hales presented undisputed evidence that Insurer had a legitimate dispute to the Hales' claim during the time the claim was being reviewed. Insurer did not breach its duty of good faith by taking longer than 90 days to settle or deny the claim, and Insurer did not breach its duty by conducting an investigation when the evidence it had showed the fire was arson and that circumstantial evidence indicated the Hales or Chance Hale had a financial motive. The Hales failed to present any evidence that Insurer acted unreasonably in investigating this claim. Where an insurance company has a legitimate dispute to a claim, it does not act in bad faith to investigate and/or litigate the claim. We therefore find the trial court erred in submitting the issue of bad faith to the jury here. Because we reverse the judgment on that ground, we do not reach Insurer's claims that the trial court erred in instructing the jury.

¶ 27 This case is remanded with instructions to enter judgment for A.G. Insurance Company.

REVERSED WITH DIRECTIONS.

ADAMS, J., and MITCHELL, P.J., concur.

had a reasonable basis to investigate the ownership of the convenience store. Although the Hales possessed legal title and asserted the claim for policy benefits, several facts, addressed earlier in this opinion, supported a finding that Chance Hale was an equitable owner of the store and therefore had an insurable interest.